AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of Californi

FILED
CLERK, U.S. DISTRICT COURT

**10/26/22**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___slo___ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

10/26/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___VAV___ DEPUTY

United States of America

v.

DAVID CONCEPTION,

Defendant

Case No.   2:22-mj-04208 -DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about May 19, 2022, until on or about September 8, 2022, in the county of Santa Barbara in the

Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Dealing in Firearms without a License |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Christopher Stantzos, Special Agent*

*Complainant's signature*

Christopher Stantzos, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   10/26/22

*Judge's signature*

City and state:   Los Angeles, California        Hon. John E. McDermott, U.S. Magistrate Judge

*Printed name and title*

AUSA: David Y. Pi (x3659)

## **AFFIDAVIT**

I, Christopher Stantzos, being duly sworn, declare and state as follows:

## I.  **INTRODUCTION**

1.   I am a Special Agent ("SA") with Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since March 2020.  I attended the ATF Academy from March through December 2020, where I received approximately 1,000 hours of formal training in various aspects of conducting firearms, explosives, arson, firearms trafficking, and gang investigations.  Before joining the ATF, I was an Intelligence Analyst ("IA") for the Federal Bureau of Investigation ("FBI") for approximately four and a half years.  As an IA, I produced intelligence products in furtherance of civil rights crimes investigations and complex international money laundering investigations.  Before joining the FBI, I was a forensic scientist for the Washington, DC Department of Forensic Sciences, where I identified, documented, preserved, and collected physical evidence from crime scenes for nearly two years.

2.   I have debriefed multiple informants, witnesses, and subjects who had personal knowledge regarding illegal firearms and narcotics trafficking.  Additionally, I have participated in many aspects of gang, firearms, and drug investigations, including undercover operations, arrests, and surveillance.  I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and

1

transportation of drugs, as well as the collection of money proceeds of drug-trafficking and money-laundering methods used to conceal the nature of the proceeds. I have participated in multiple investigations involving the illegal manufacture and sale of firearms. I am familiar with the methods employed by gang members to thwart detection by law enforcement including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

3.    Currently, I am assigned to the Los Angeles Field Division, Santa Maria Satellite Office ("SMSO") of the ATF. I have been assigned to the SMSO since March 2020, in which time I have participated in controlled purchase operations, undercover operations, search warrants, and gang investigations in Los Angeles, Santa Barbara, Ventura, and San Luis Obispo Counties.

## II. <u>PURPOSE OF AFFIDAVIT</u>

4.    This affidavit is made in support of a criminal complaint and arrest warrant against DAVID CONCEPTION ("CONCEPTION") for a violation of 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms without a License.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my

knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   From May 2022 to September 2022, an ATF Confidential
Informant[1] ("CI") and Undercover ATF Special Agent ("UC")
purchased nine firearms, including one machinegun and two
machinegun conversion devices, approximately 110 grams of
fentanyl pills, and firearms ammunition and accessories on five
separate occasions from CONCEPTION at 843 Patti Lane, Santa
Maria, CA 93458 ("CONCEPTION's Residence").  In addition, both
the CI and the UC observed additional firearms, firearms parts
and accessories, and tools to manipulate firearms at
CONCEPTION's Residence which CONCEPTION did not sell to the CI
or UC.

7.   On October 5, 2022, a Firearms Enforcement Officer
("FEO") at the ATF Firearms Technology and Control Branch
("FTCB") examined, tested, and classified one firearm and two
machinegun conversion devices previously possessed by CONCEPTION
as machineguns.  CONCEPTION does not have a license to sell
firearms, and has no firearms registered with the National

---

[1] The CI has provided reliable, credible, and actionable
intelligence that ATF corroborated through independent ATF
investigations and contact with other law enforcement agencies.
In 2021, the CI was charged by the state of California for being
a felon in possession of a firearm and illegally growing
marijuana, to which s/he has since pleaded guilty.  The CI is
cooperating with the ATF and Santa Barbara Sheriff's Office for
consideration in the state case.

Firearms Registration and Transfer Record ("NFRTR").  On October 18, 2022, ATF Special Agents and SBSO detectives served federal search warrants for the premises located at 843 Patti Lane Santa Maria, California 93458, and the person of CONCEPTION.  During the search of the premises at 843 Patti Lane, agents and detectives recovered multiple firearms, one suspected silencer, four suspected "Glock Switch" machinegun conversion devices, ammunition, and numerous firearms parts and accessories.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   May 19, 2022, Purchase of a Machinegun from CONCEPTION**

9.   In April 2022, the CI contacted me and informed me that s/he learned through an unwitting informant that CONCEPTION was selling firearms in Santa Maria, CA, and that these firearms were possibly trafficked from outside of California.  Following this, I directed the CI to obtain CONCEPTION's contact information and contact CONCEPTION regarding any firearms CONCEPTION may have for sale.

10.   In late April 2022, the CI, at my direction, began exchanging text messages and recorded phone calls with CONCEPTION.  During one text message conversation on April 28, 2022, CONCEPTION sent the CI an image of a 1911-style pistol with a drum magazine.  After the CI asked how much the pistol cost, CONCEPTION stated, "27.  And its ghost.  I've never seen a ghost 1911."  Based on my training and experience, I believe

4

CONCEPTION was referring to $2,700 when he stated "27" and to a "privately manufactured firearm[2]" when he stated "ghost." Following this, CONCEPTION sent the CI another image of a black pistol with multiple magazines and stated, "There [sic] both the same one / 45ACP." Following this, the CI contacted me and informed me of the conversation with CONCEPTION.

11.   On May 12, 2022, CONCEPTION initiated a recorded phone call with the CI. During the call, CONCEPTION and the CI discussed what firearms CONCEPTION had for sale. CONCEPTION told the CI he had two "Glock 48" pistols for sale for $1,300 each and an AR-type, 9mm caliber pistol for approximately $2,400.00. Following this, CONCEPTION sent the CI an image, via text message, of two black privately manufactured pistols. One pistol appeared to have a Glock slide and a Polymer80 frame, with a magazine inserted; the other appeared to have a slide with no markings and a Polymer80 frame. CONCEPTION then told the CI, "I paid 12 for em" and "I'll hold em for u if you can give me the 26." Based on my training and experience, I believe CONCEPTION was stating he paid $1,200 for each pistol and would sell them to the CI for $2,600. Following this, the CI contacted me and informed me of the conversation with CONCEPTION.

12.   Between May 14 and May 17, 2022, CONCEPTION exchanged text messages with the CI. CONCEPTION sent the CI a video of an

---

[2] A privately manufactured firearm (commonly referred to as a "ghost gun" is a firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced.

individual pointing a pistol at the ground.  The pistol appeared
to have a drum magazine inserted into it and a flashlight which
was on.  The individual then raised the pistol towards an
embankment and fired the pistol, with several rounds of
ammunition being expended with a single pull of the trigger.
The individual then repeated this process three additional times
in the same video.  The CI then asked CONCEPTION what the price
of the firearm in the video was, to which CONCEPTION replied,
"I'll throw in that AR9 wit it being auto and two 48s for 5k and
ammo wit the drums and all that lmk I got the 2 48s saving em
for u."  Based on my training and experience, I believe
CONCEPTION was stating that he had an AR-type, 9mm caliber
pistol that was a machinegun and two Glock Model 48-type pistols
and wanted $5,000 for those three firearms.  Later, CONCEPTION
sent the CI a picture and video of a privately manufactured
pistol with a black slide, gray frame, an electronic sight, and
a what appeared to be machinegun conversion device attached
(commonly known as a "Glock Switch").  The CI then asked
CONCEPTION if the pistol in the video was a machinegun, to which
CONCEPTION replied it was and said he "got it for only
13…without the go fast.  I just threw that on there lol."  Based
on my training and experience, I believe CONCEPTION stated he
purchased the pistol for $1,300 and attached the "go-fast," what
I believe to be the Glock Switch machinegun conversion device,
to the pistol himself, converting it to a machinegun.  Later, in
the same conversation, CONCEPTION told the CI he would sell the
machinegun to the CI for $1,800.  Following this, the CI

contacted me and informed me of the conversation with
CONCEPTION.

13.   On May 19, 2022, after speaking with ATF SAs Ricky
Chan, Bryan Traverso, and detectives with the Santa Barbara
Sheriff's Office ("SBSO"), I learned the following series of
events from May 19, 2022:

a.     The CI met SAs Chan and Traverso at a
predetermined meeting location.  At the location, SAs Chan and
Traverso searched the CI and the CI's vehicle for contraband,
with negative results.  SAs Chan and Traverso then provided the
CI with $4,400 in government funds and equipped the CI with
concealed electronic monitoring and recording devices.  I have
reviewed the recordings from these devices.  Next detectives and
agents followed the CI to CONCEPTION's Residence.  During this
time, detectives and agents did not observe the CI make any
unscheduled stops or contacts.  Following this, the CI arrived
at CONCEPTION's Residence and SBSO detectives observed the CI
knocking on the front door of CONCEPTION's Residence.  The CI
then encountered a small female child opening the door and the
CI asked for CONCEPTION.  CONCEPTION then came to the front door
and greeted the CI, leading the CI to the back room where
CONCEPTION's son was located.  Following this, CONCEPTION asked
his son to exit the room.

b.     CONCEPTION then opened a blue suitcase that
contained multiple firearms and firearms accessories.
CONCEPTION described one pistol as "brand new, no serial" and
others as "those are the 48s."  CONCEPTION then told the CI one

of the firearms was his personal Walther pistol and described the customizations he made to it.  Following this, CONCEPTION and the CI discussed different magazines and firearms parts and accessories.

c.    Shortly after this, the CI asked if one particular pistol, which was gray in color, was a machinegun, to which CONCEPTION replied, "I don't have it on, I'll put it on for you."  CONCEPTION began to attach  a Glock Switch to the gray firearm and stated, "I'll give you this plate too, so you can have it just in case you go to the range."  Based on my training and experience, CONCEPTION was telling the CI how to convert a semi-automatic pistol into a machinegun and providing the CI with firearms parts to convert the machinegun back to a semi-automatic pistol.

d.    Later in the conversation, the CI and CONCEPTION began discussing an AR-style rifle CONCEPTION possessed.  CONCEPTION then removed an AR-style rifle from the closet of the bedroom and stated, "This one is fully auto too, it has the beam in it."  Based on my training and experience, I believe CONCEPTION was stating that the AR-style rifle he possessed was a machinegun and had an "auto sear" (what CONCEPTION referred to as a "beam") in it.

e.    Next, CONCEPTION took the gray firearm and finished attaching the Glock Switch machinegun conversion device to the gray pistol for the CI.  CONCEPTION then described to the CI how to remove the machinegun conversion device.  Following this, CONCEPTION and the CI engaged in additional conversation

about machinegun conversion devices.  During this conversation, CONCEPTION stated he asked an unidentified associate who owned a 3D-printer if he could print Glock Switch for him.

f.   Shortly after this, CONCEPTION told the CI, "This is the [Glock] 43X…this one is not even allowed in California." CONCEPTION then told the CI his associate sold him the Glock 43X pistol for $1,000.00 and CONCEPTION could sell it for $2,000.

g.   Following some casual conversation, CONCEPTION and the CI agreed on a total price of $4,400 for three pistols, two black pistols and one gray pistol with the Glock switch conversion device installed on it.  CONCEPTION then told the CI he had been purchasing "candy" for $5 each and selling them for up to $15 each.  Based on my training and experience, I believe CONCEPTION was referring to buying and selling fentanyl pills or other narcotics.  CONCEPTION continued to describe the prices of narcotics he was purchasing and selling from various unidentified suppliers.  Shortly after this, the CI counted out $4,400 in government funds and placed them in front of CONCEPTION.  Shortly after this, CONCEPTION told the CI about an unidentified associate of his who built a "fully automatic AR" rifle.  CONCEPTION stated that if his associate had taken the rifle to the shooting range, "They would've arrested [his] ass." The CI then gathered the pistols and left the room with CONCEPTION.

h.   SBSO detectives then observed the CI and CONCEPTION exit CONCEPTION's Residence and the CI place a black plastic bag inside his/her vehicle.  CONCEPTION and the CI

continued to engage in conversation outside of the CI's vehicle. CONCEPTION then told the CI that associates of his sell narcotics in Lompoc, CA.

       i.    Shortly after this, the CI exited the area of CONCEPTION's Residence and agents and detectives followed the CI back to a predetermined meeting location.  At the location, SAs Chan and Traverso retrieved three firearms, including one with a Glock Switch machinegun conversion device attached, ammunition and additional firearms parts and accessories from the CI and took them into ATF custody.  Agents also recovered the electronic monitoring and recording devices and searched the CI and the CI's vehicle for contraband with negative results.

      14.  In July 2022, I sent the above-mentioned gray firearm, with the Glock Switch that CONCEPTION installed on it, to the ATF FTCB to determine if this firearm and conversion device was a machinegun under Title 18 USC 921(a)(24).  On October 5, 2022, an FTCB FEO examined, tested, and classified this firearm and the installed Glock Switch conversion device as a machinegun.

### B.    Purchase of 10.6 grams of Fentanyl Pills from CONCEPTION on June 8, 2022

      15.  On June 4, 2022, CONCEPTION exchanged text messages with the CI during which CONCEPTION informed the CI he had additional firearms available for sale.  Following this, the CI contacted me and informed me of the conversation.

      16.  On June 7, 2022, I directed the CI to contact CONCEPTION and ask CONCEPTION about purchasing suspected fentanyl pills, aka 'M30s' or 'blues.'  During their previous

firearms deal, CONCEPTION indicated to the CI that he could sell the CI such narcotics.  A short while later, the CI initiated a phone call with CONCEPTION.  The conversation was not recorded as the CI did not have a recording device available at the time of the call; however, the CI immediately contacted me following the call with CONCEPTION.  During their conversation, CONCEPTION agreed to sell the CI $1,000 worth of pills at approximately $10 per pill on June 8, 2022.  CONCEPTION then stated he currently had approximately five "boats" of pills on him.  Based on my training and experience, I believed the term "boat" referred to 1,000 pills.  CONCEPTION additionally stated he would drop the price to approximately $4 to $6 per pill if the CI purchased pills in larger quantities.

17.  Based on my personal experience and after speaking with SBSO detectives and reviewing audio and video recordings of the deal, I learned the following series of events from June 8, 2022:

a.    The CI met me and SA Chan at a predetermined meeting location.  At the location, SA Chan and I searched the CI and the CI's vehicle for contraband with negative results.  Next, I equipped the CI with electronic monitoring and recording devices and provided the CI with documented government funds to purchase the narcotics from CONCEPTION.

b.    Following this, I directed the CI to go to CONCEPTION's Residence while agents and detectives followed the CI and maintained visual and technical surveillance.  While the CI drove to the deal location, at no point did agents or

11

detectives observe the CI make any unscheduled stops or contacts.

      c.   Once the CI arrived at CONCEPTION's Residence, SBSO detectives observed the CI exit his/her vehicle and enter the front door of CONCEPTION's Residence.  Upon entering CONCEPTION's Residence, the CI was greeted by CONCEPTION. During the recording, I could hear what sounded like children's voices in the background.

      d.   After some casual conversation about CONCEPTION's car, CONCEPTION told the CI the fentanyl pills he had for sale were "good ones," and he could get the CI pills for $2 each but questioned the quality of the cheaper pills.  When the CI questioned if the pills CONCEPTION possessed were from his associates in Lompoc, CONCEPTION stated they were not, but his Lompoc connection supplied pills that were "fire."  CONCEPTION then told the CI an unidentified Mexican individual sold cheap pills to CONCEPTION's friend and stated only half of those cheap pills worked, while some caused stomach pain or "blew up" when smoked.

      e.   Following this, the CI and CONCEPTION discussed dealing in larger quantities of pills, such as multiple "boats" of pills at a time.  At this point, the CI and CONCEPTION were interrupted by a child, who CONCEPTION told to "go over there." CONCEPTION then audibly counted out pills for the CI. CONCEPTION told the CI how you can't accurately calculate the number of pills by weighing them.  During this conversation, children's voices could be heard in the background.

f.   Shortly after this, CONCEPTION told the CI how his best friend growing up overdosed and died from "fake Xanax." The CI then asked CONCEPTION about what firearms he had, and CONCEPTION proceeded to describe a privately manufactured pistol and what CONCEPTION referred to as an "MP5."  CONCEPTION then finished counting out the M30 pills for the CI, who provided CONCEPTION with $1,000.00 in documented government funds.

g.   Next, CONCEPTION stated the next batch of pills for sale would be of the same quality as the ones he gave to the CI.  CONCEPTION stated his supplier informs CONCEPTION when the quality of the pills goes up or down and both CONCEPTION and his supplier adjust the price of the pills accordingly.  The CI then asked if CONCEPTION's supplier could take an order of approximately 3,000 pills, to which CONCEPTION replied, "he has like 30 boats right now…maybe even 50…He spends like 60 to 100 thousand [dollars] at a time."  CONCEPTION then described his supplier as a "youngster" who used to "car hop…check cars and see if they're open" and how his supplier once found $4,000 in one car and stole it.

h.   After this, CONCEPTION took the CI to the garage of CONCEPTION's Residence to show the CI the "MP5" firearm. CONCEPTION then described the customizations he made to the firearm, which he stated was a "9mm, which makes it so rare." During this time, a child's voice can be heard in the background of the recording.

i.   Following this, CONCEPTION told the CI he took the firearm to a shooting range and put two rounds in the

firearm and expelled both with a single pull of the trigger. CONCEPTION stated he then put three rounds in the firearm and expelled all three with a single pull of the trigger. Following this, CONCEPTION stated an employee of the shooting range approached him and told CONCEPTION he "Couldn't shoot like that here you know, you'll get in big trouble." Based on my training and experience and knowledge of this investigation, I believe CONCEPTION was telling the CI the firearm he possessed and fired was a machinegun.

j. Next, CONCEPTION gave the CI an extended 9mm caliber pistol magazine for one of the firearms CONCEPTION previously sold to the CI. CONCEPTION claimed the magazine's capacity was 21 rounds. At this point in the recording, I could hear a child's voice in the background again. Following this, CONCEPTION stated he could get the CI a "Glock 19" for the CI, but clarified he was referring to a pistol with a Glock Model 19 slide and a non-Glock polymer frame. Shortly after this, the CI exited CONCEPTION's residence and returned to his/her vehicle.

18. After the CI exited the area of the deal location, agents and detectives followed the CI to a predetermined meeting location. While following the CI, at no point did law enforcement observe the CI make any unscheduled stops or contacts while returning to the predetermined meeting location.

19. Next, at the predetermined meeting location, I recovered a plastic baggie containing 100 blue pills with "M30" stamped on them, and one 9mm caliber extended pistol magazine from the CI and placed them into ATF custody. SA Chan and I

14

then searched the CI and the CI's vehicle for contraband with negative results.  I later weighed the pills and found them to weigh approximately 12.2 grams in the plastic baggie.

20.   On or about June 14, 2022, I submitted the above-described pills to the Drug Enforcement Agency ("DEA") Southwest Laboratory for analysis.  On July 14, 2022, I received and reviewed a DEA Southwest Laboratory Chemical Analysis Report which stated the pills I submitted consisted of 10.6 grams of p-Fluorofentanyl and Fentanyl.

### C.   Purchase of Firearms and Machinegun Conversion Devices from CONCEPTION on July 20, 2022

21.   On May 23, 2022, the CI, at my direction, initiated a recorded phone call with CONCEPTION.  During the recorded conversation, the CI and CONCEPTION discussed a pistol magazine that CONCEPTION owed the CI.  Following this, CONCEPTION told the CI he had a "Mini AR-2, a 9 mil."  Based on my training and experience, I believe CONCEPTION was stating that he had a 9mm caliber, AR-style pistol in his possession.  CONCEPTION then described to the CI the modifications he was making to this firearm.  Following this, the CI informed CONCEPTION there were issues with the performance of one of the firearms CONCEPTION had previously sold the CI, a Polymer80 pistol with a Glock Switch machinegun conversion device.  When the CI asked if CONCEPTION had fired this firearm as a machinegun before, CONCEPTION stated he had.  CONCEPTION then stated he "tried everything out on it" and used drum magazines with the firearm. CONCEPTION claimed it was not the gun that was having issues,

but possibly the magazines.  CONCEPTION then continued describing the modifications he planned to make to the AR-style pistol he possessed and stated he planned to spend an additional $1,000 on it, and to eventually sell it for $2,000.  CONCEPTION later told the CI he would sell the AR-style pistol without modifications, but with a drum magazine, for $1,600.  Following this, the CI and CONCEPTION continued to discuss the issues with the previously described pistol that the CI bought from CONCEPTION.  CONCEPTION stated it was not the Glock Switch that was giving the firearm issues and suggested tightening the bolt on the Glock switch to keep the firearm firing as a machinegun. Following this, the CI contacted me and informed me of the conversation with CONCEPTION.

22.  Later that day, CONCEPTION initiated a partially recorded phone call with the CI.  The call was only partially recorded as it was unexpected, and the CI was not able to access the recorder until partway into the call.  During the phone conversation, CONCEPTION and the CI discussed the AR-style pistol CONCEPTION possessed.  CONCEPTION stated he could, "clean it up with the Dremel and make it thinner" when referring to parts of the AR-style pistol.  Following this, the CI contacted me and informed me of the conversation with CONCEPTION.

23.  On May 29, 2022, CONCEPTION initiated a partially recorded phone call with the CI.  The call was only partially recorded as it was unexpected, and the CI was not able to access the recorder until partway into the call.  During the conversation, CONCEPTION and the CI discussed firearms

16

CONCEPTION had for sale.  CONCEPTION also sent the CI a video, via text message, of four privately manufactured pistols on a table at an unidentified indoor shooting range.  The video then showed an individual with tattoos on their right hand and arm loading, charging, and firing an AR-style pistol.  Following this, the CI contacted me and informed me of the conversation with CONCEPTION.

24.  On June 15, 2022, CONCEPTION sent the CI, via text message, a picture of a privately manufactured pistol with a laser sight attachment and stated it cost "14 wit laser."  Based on my training and experience, I believe CONCEPTION was stating he wanted $1,400 for the pistol with the attached laser sight. Following this, the CI contacted me and informed me of the conversation with CONCEPTION.

25.  Later that same day, CONCEPTION sent a text message to the CI stating, "I got another one of those go-fast things I'll throw in for u…cuz of what happened."  Based on my knowledge of this investigation, I believe CONCEPTION was referring to possessing a Glock Switch when using the term "go-fast things." Following this, the CI contacted me and informed me of the conversation with CONCEPTION.

26.  On July 19, 2022, the CI, at my direction, initiated a recorded phone call with CONCEPTION.  During the recorded conversation, CONCEPTION and the CI discussed what firearms CONCEPTION had available for sale.  CONCEPTION stated it was difficult for him to obtain firearms lately, both privately manufactured Polymer80 pistols and serialized firearms.

CONCEPTION told the CI, "You have to find someone out of state" to buy firearms and then "Go to a shop and they'll order it." CONCEPTION then told the CI he had multiple firearms in his possession, including a Glock model 19-style pistol, a Glock model 17-style pistol, a Glock model 43X (which CONCEPTION clarified was a real Glock pistol, not a privately manufactured pistol), and a Glock model 43-style pistol.  CONCEPTION told the CI he wanted to keep the Glock model 43X pistol because it was a gift and didn't know how to get another.  When the CI asked if CONCEPTION could get a Glock model 43X from out of state, CONCEPTION stated his cousin, who used to live outside of California and obtained firearms and parts for CONCEPTION, moved back to California.  Following this, the CI contacted me and informed me of the conversation with CONCEPTION

27.  Based on my personal experience and after speaking with SBSO detectives, an ATF UC, and reviewing the audio and video recordings of the deal, I learned the following series of events from July 20, 2022:

a.  SA Chan and I met the CI and UC at a predetermined meeting location.  At the location, SA Chan and I searched the CI and the CI's vehicle for contraband with negative results.  Next, the UC equipped him/herself with electronic monitoring and recording devices and I provided the UC with documented government funds to purchase firearms from CONCEPTION.  Following this, I directed the CI to call CONCEPTION and inform CONCEPTION the CI was on his/her way.  During the call, which SA Chan and I overheard, CONCEPTION told

the CI his girlfriend was over and to wait until she left CONCEPTION's Residence.  Shortly after this, CONCEPTION exchanged text messages to the CI in which CONCEPTION told the CI to come to his home a short while later and call him when the CI arrived.

b.    Next, the UC and CI drove in the CI's vehicle to CONCEPTION's Residence.  SA Chan and I followed them and maintained visual and technical surveillance.  At no point did agents observe the CI make any unscheduled stops or contacts. While conducting surveillance at CONCEPTION's Residence, SBSO detectives observed CONCEPTION enter a car and leave the area of his residence.

c.    Following this, the UC and CI arrived outside of CONCEPTION's Residence and waited for CONCEPTION to return.  A short while later, SBSO detectives observed CONCEPTION return to his residence in the same car.  CONCEPTION and an unidentified individual then met with the UC and CI in the driveway of CONCEPTION's Residence.  At that point, CONCEPTION discussed the sale of his Glock 43X pistol, but was unsure if he wanted to sell it.  CONCEPTION then advised the UC that he had a "PPQ," which, based on my training and experience, I know to be a Walther PPQ pistol, for sale and was willing to sell it.  When the UC questioned CONCEPTION about issues he/she encountered with a previous Glock Switch the CI had purchased, CONCEPTION explained that the Glock Switch must be attached tightly. CONCEPTION then stated he had another Glock Switch that was less noticeable (when installed) and claimed he paid $600 for it.

CONCEPTION offered to sell another Glock Switch that day and compensate the UC for the issues with the previous Glock Switch.

    d.    CONCEPTION then explained the 43X he possessed was an actual Glock pistol, and he also had a Walther PPQ pistol, a Glock model 17-type Polymer80 pistol, and a Glock model 19-type Polymer80 pistol for sale.  CONCEPTION also stated an associate of his had an unregistered Glock model 19 pistol for sale, but explained this associate attempted to obliterate the serial number.  CONCEPTION opined this was worse (than having an unregistered pistol) because it was "tampering."  CONCEPTION, the CI, and the UC further conversed about the additional firearm, and decided to complete that transaction at a later date.

    e.    Following this, CONCEPTION, the CI, and the UC entered the garage of CONCEPTION's Residence and closed the garage door.  CONCEPTION then displayed his Glock 43X pistol, with a silver slide, to the CI and UC.  CONCEPTION was unwilling to sell the firearm at that point.

    f.    Next, CONCEPTION removed two additional pistols from a nylon bag, including a Glock 17-type Polymer80 pistol, with a laser sight, and a Glock 19-type Polymer80 pistol with a red-dot sight and handed them to the UC and CI for examination.  CONCEPTION then removed and unloaded the Walther PPQ pistol (which I later identified as a Walther PPQ Q5 Match 9mm pistol bearing serial number FCZ8043), explained the differences in the operation of the magazine release switch, and discussed the laser sight on the pistol.  CONCEPTION claimed the laser sight

was solar powered and always turned on, and that the pistol was designed for competition shooting.

g.   Following this, the UC began price negotiations for the sale of the firearms.  Again, CONCEPTION was unwilling to sell his Glock 43X pistol, but indicated he might sell it next time with another Glock 19 pistol.  CONCEPTION then explained his hesitancy because Polymer80 pistol frames were not being produced anymore and stated words to the effect "they are illegal as fuck."  Next, CONCEPTION removed multiple firearm magazines from the same bag and displayed them to the UC and CI.  CONCEPTION then confirmed he worked on the Polymer80 pistols himself.  CONCEPTION again stated he wanted to keep the Glock 43X pistol, noting the firearm had a single stack magazine that held 12 rounds of ammunition, it fit his hand, and he could carry it around.  CONCEPTION stated he purchased the ammunition in Las Vegas, Nevada.

h.   Next, the UC and CONCEPTION discussed the prices of the items for sale.  CONCEPTION confirmed he would sell one Glock Switch and provide another free of charge.  CONCEPTION agreed to sell the Glock 17-type Polymer80 pistol with a laser sight and 17-round capacity magazine for $1,400, the Glock 19-style Polymer80 pistol with a sight for $1,600, and the Walther PPQ pistol for $2,200.  CONCEPTION told the UC the Walther PPQ pistol was not stolen but was not registered in California and was from out of state, claiming the pistol sold for $2,000 new in the store.  After some additional negotiation, CONCEPTION agreed to sell a Glock Switch for $600, along with a free Glock

Switch, and additional firearms magazines for a total of
$6,000.00.

      i.   Shortly after this, a child entered the garage of
CONCEPTION's Residence.  CONCEPTION then pointed out the
differences in the two Glock Switches to the UC and CI and
stated one of the Glock Switches was meant to be inconspicuous.
CONCEPTION then asked an individual presumed to be CONCEPTION's
father where an item was in the garage.  CONCEPTION's father
then obtained a firearm drum magazine from one of the upper
shelves in the northeast corner of the garage.

      j.   Next, the UC counted out $6,000 in government
funds and laid them out in front of CONCEPTION.  During this
time, CONCEPTION put the firearms and magazines (some with
ammunition) into a box.  CONCEPTION then provided two additional
loaded magazines as part of the transaction and discussed the
Glock 19 pistol for a later transaction.

      k.   Shortly after this, the UC and CI exited the
garage of CONCEPTION's Residence and left the area in the CI's
vehicle.  Agents and detectives then followed the UC and CI to a
predetermined meeting location.  At the location, I took the
electronic monitoring and recording devices and the following
items into ATF custody: one Walther PPQ Q5 Match 9mm pistol,
bearing serial number FCZ8043 (with one magazine); one Polymer80
pistol model PF940V2 (with one magazine), 9mm caliber with no
serial number and a laser attachment; one Polymer80 pistol model
PF940C (with one magazine), 9mm caliber, and a sight attached;
one Glock Switch machinegun conversion device (plastic, with a

screw and bolt); one Glock Switch machinegun conversion device (plastic); one 9mm caliber firearm drum magazine; one 9mm caliber, 40-round capacity firearm magazine; one 15-round capacity firearm magazine; 26 rounds of assorted 9mm caliber ammunition.  SA Chan and I then searched the CI and the CI's vehicle for contraband with negative results.

28.  In September 2022, I sent the above-mentioned Glock Switch machinegun conversion devices to the ATF FTCB to determine if these conversion devices were machineguns under Title 18 USC 921(a)(24).  On October 5, 2022, an FTCB FEO examined, tested, and classified these Glock Switches as machineguns.

> **D.   Purchase of Glock Model 19 Pistol and Approximately 100 grams of Suspected Fentanyl Pills on September 8, 2022**

29.  On September 6, 2022, the CI, at my direction, sent a text message.  In the message, the CI greeted CONCEPTION, but CONCEPTION did not respond via text message.  A short while later, CONCEPTION initiated a series of unrecorded phone calls with the CI using the same phone number.  The calls were not recorded as the CI did not have access to a recorder at the time of the calls.  During the calls, the CI and CONCEPTION discussed arranging a future purchase of firearms and narcotics. Following this, the CI contacted me and informed me of the conversation

30.  On September 7, 2022, CONCEPTION initiated a series of text messages and unrecorded phone calls with the CI.  The phone calls were not recorded as the CI did not have access to a

recorder at the time of the calls.  During their phone conversations, CONCEPTION told the CI he was in Las Vegas, but would be available to meet the following day.  CONCEPTION stated he had multiple firearms for sale and could sell the CI 1,000 suspected fentanyl pills for $6.50 per pill.  Based on my training, experience, and knowledge of this investigation, I know the pills CONCEPTION previously sold the CI contained fentanyl and suspected these pills were similar narcotics. During a subsequent documented text message conversation, CONCEPTION sent the CI a video of a firearm with a Glock 19 slide, a Glock logo on the grip, and a blue trigger.  Following this, the CI contacted me and informed me of the conversation.

31.  On September 8, 2022, the CI placed an unrecorded phone call to CONCEPTION.  The phone call was not recorded as the CI did not have access to a recorder at the time of the call.  On the same date, during a text message conversation, the CI and CONCEPTION agreed to meet later that day to conduct their firearms and narcotics transaction.  During the unrecorded phone call, CONCEPTION told the CI he had to obtain the pills from another individual, and the price would be $7 per pill. Following this, the CI contacted me and informed me of the conversation.

32.  Based on my personal experience and after speaking with SBSO detectives, the ATF UC, and reviewing the audio and video recordings of the deal, I learned the following series of events from September 8, 2022:

24

a.   SA Chan and I met the UC and CI at a predetermined meeting location.  At the location, SA Chan and I searched the CI and the CI's vehicle for contraband with negative results.  Next, the UC equipped him/herself with electronic monitoring and recording devices, and I provided the UC with documented government funds to purchase the firearm and narcotics from CONCEPTION.

b.   Following this, I directed the CI to contact CONCEPTION via cell phone and inform CONCEPTION the CI was on his/her way to CONCEPTION's Residence.  Next, the UC and CI drove in the own vehicles to CONCEPTION's Residence while SA Chan and I followed them and maintained visual and technical surveillance.  At no point did SA Chan or I observe the CI make any unscheduled stops or contacts.

c.   Next, the UC and CI arrived outside of CONCEPTION's Residence and SBSO detectives observed the UC and CI exit their vehicles and approach CONCEPTION's Residence. Shortly after this, the UC and CI met with CONCEPTION at the east door of his residence.  The CI and CONCEPTION discussed the narcotics transaction for approximately 1,000 suspected fentanyl pills.  CONCEPTION claimed he was doing a favor for the UC and CI and that he did not personally deal with pills.  Following this, the UC, CI, and CONCEPTION discussed plans to travel to Lompoc, CA to conduct the fentanyl pills transaction. CONCEPTION stated that neither the UC nor the CI would be able to enter the fentanyl pill supplier's ("SUPPLIER") residence to complete the narcotics sale.  After some discussion of the

logistics of the deal, CONCEPTION began to request the money for the suspected fentanyl pills (in advance), as the SUPPLIER would not want any other individuals present for the deal.  CONCEPTION confirmed they would be going to the SUPPLIER's residence in Lompoc, CA and the SUPPLIER was not able to come to CONCEPTION's Residence.  At one point, CONCEPTION discussed leaving his son with the UC and CI as collateral for receiving the government funds for the narcotics deal in advance.  During further discussion, CONCEPTION stated the SUPPLIER was male, black, and was like family to CONCEPTION.

        d.    Shortly after this, the UC attempted to cancel the narcotics transaction with CONCEPTION and the SUPPLIER as the UC was uncomfortable with providing the government funds up front to CONCEPTION.  The UC also indicated s/he wanted to obtain the pills at a lower price.  After some additional negotiating, CONCEPTION used his cell phone in the presence of the UC and CI and discussed the narcotics sale and the issue of providing the government funds in advance with an unidentified individual.  Based on my knowledge of this investigation, I believe this individual was the SUPPLIER.  After some conversation, the UC overheard CONCEPTION tell the SUPPLIER they would figure out the details of the transaction and head to Lompoc, CA.  CONCEPTION then told the UC and CI the SUPPLIER was willing to conduct the sale at his residence in Lompoc, CA.

        e.    Following this, an unidentified male appeared at CONCEPTION's Residence and CONCEPTION and the UC discussed conducting a firearm sale.  The UC then followed CONCEPTION into

CONCEPTION's Residence to a bedroom where they encountered an older male and a young child.  CONCEPTION then retrieved a Glock model 19 pistol from near the closet of the bedroom and led the UC to the living room to complete the sale.  CONCEPTION handed the UC a Glock model 19 pistol with the serial number removed from the frame, the serial number on the slide obliterated, and the serial number on the barrel reading AXU536, along with one magazine.  The UC and CONCEPTION then discussed the sale of another firearm, but the UC told CONCEPTION s/he only had enough funds for one firearm this time.  The UC then asked CONCEPTION about the blue trigger on the above-described firearm and CONCEPTION explained it was a custom trigger, valuing it at $600.  After negotiations, the UC and CONCEPTION agreed to a price of $1,600 for the firearm and magazine.  The UC handed CONCEPTION $1,600 in government funds, which CONCEPTION appeared to count.

f.   After this, CONCEPTION asked the UC if the UC could obtain real pills, specifically asking about "oxy 20s" and "norcos."  Next, the UC returned to the UC's vehicle and the UC stored the purchased Glock 19 pistol in the vehicle.  CONCEPTION then emerged from his residence and told the CI and UC to follow CONCEPTION and his associate in a Red Ford Fusion bearing California license plate number 6BTN669.  Following this, the UC and CI left CONCEPTION's Residence in the UC's vehicle, following the red Fusion.

g.   During this time, agents and detectives maintained visual and technical surveillance of both the UC

vehicle and the red Fusion.  Based on my knowledge of this
investigation and conversations with SBSO narcotics detectives,
I believed the SUPPLIER's residence was located at 416 W. North
Avenue, Apartment #1, in Lompoc, CA.  I also knew, based on my
analysis of AT&T call records for CONCEPTION'S cell phone, (805)
825-1028, that CONCEPTION's phone was in regular contact with an
individual known to myself and SBSO detectives as a major
narcotics dealer in Lompoc, CA.  Based on the above information,
I believed the SUPPLIER was J.P.

       h.   After following CONCEPTION and the unidentified
male in the red Fusion for approximately 30 minutes, the UC and
CI arrived at the Fiesta Apartments, located at 416 W. North
Avenue in Lompoc, CA.  The UC and SBSO detectives then observed
CONCEPTION exit the red Fusion and walk in the direction of
Apartment #1 in the Fiesta Apartments and out of view of law
enforcement.

       i.   A short while later, CONCEPTION remerged from the
area of Apartment #1 in the Fiesta Apartments and approached the
UC's vehicle.  CONCEPTION then handed the UC a black plastic bag
containing blue suspected fentanyl pills with "M30" stamped on
them.  CONCEPTION claimed he did not look at the pills or touch
them.  CONCEPTION then opened the fanny pack he was wearing and
the UC placed $7,000 in government funds into the pack.  Shortly
after this, CONCEPTION indicated to the UC that the Glock pistol
he had previously sold to the UC was not stolen.  The UC and CI
then exited the area of the Fiesta Apartments in the UC vehicle,
while SBSO detectives observed CONCEPTION return to the area of

Apartment #1.  A short while later, SBSO detectives observed CONCEPTION return to the red Fusion with the unidentified male and exit the area of the Fiesta Apartments.

       j.   Following this, SA Chan and I followed the UC and CI back to a predetermined meeting location.  At no point did agents observe the CI, after returning to his/her own vehicle, make any unscheduled stops or contacts.  At the predetermined meeting location, I recovered one Glock 19 pistol, 9x19 caliber, with the serial number plate removed from the frame, and one Glock 17-round magazine from ATF UC.  I observed the serial number on the slide of the pistol to be obliterated, while the serial number on the barrel read AXU536.  I then recovered a plastic bag containing approximately 1,000 blue M30 pills suspected to contain fentanyl.  I later weighed the bag of pills and found it to weigh approximately 100.3 grams.  Next, I recovered the electronic monitoring and recording devices from the UC and placed all items into ATF custody.  SA Chan and I then searched the CI and the CI's vehicle for contraband with negative results.

33.  On or about September 19, 2022, I submitted the above-described pills to the DEA Southwest Laboratory for analysis. On October 14, 2022, I received and reviewed a DEA Southwest Laboratory Chemical Analysis Report which stated the pills I submitted weighed 98.05 grams and contained Fentanyl.

**E.    Queries of FLS and NFRTR Systems for Licenses for CONCEPTION**

34.  On May 24, 2022, I submitted a request to an ATF IOI to determine if CONCEPTION had a record within the Federal Licensing System ("FLS") as a current, former, or pending applicant/licensee.  On the same day, I learned CONCEPTION had no identifiable record within the FLS to sell firearms as a course of business.  To the best of my knowledge, CONCEPTION has not been employed during the course of this investigation.

35.  On August 3, 2022, I submitted a query to the NFRTR to determine if CONCEPTION had registered the above-described machinegun and machinegun conversion devices as required under Title 26, United States Code, Section 5861(d).  On the same day, I learned CONCEPTION had no firearms registered with the NFRTR in his name.

**F.    Search of Residence at 843 Patti Lane and CONCEPTION on October 18, 2022**

36.  On October 18, 2022, ATF Special Agents and SBSO detectives served federal search warrants for the premises located at 843 Patti Lane Santa Maria, California 93458, and the person of CONCEPTION.  During the search of the premises at 843 Patti Lane, agents and detectives recovered multiple firearms, one suspected silencer, four suspected "Glock Switch" machinegun conversion devices, ammunition, and numerous firearms parts and accessories.  These firearms parts and accessories included jigs, incomplete frames, upper receivers, magazines, and tools, such as drill presses and Dremel tools, which, based on my training and experience, could be used to manufacture firearms.

## V.  <u>CONCLUSION</u>

37.   For all of the reasons described above, there is probable cause to believe CONCEPTION has committed a violation of 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms without a License.

/s/
_____
Christopher Stantzos, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>26th</u> day of October, 2022.

_____
HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE